IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Lisa Anne Hemming, | ) | C/A No.: 1:16-93-PMD-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On May 15, 2012, Plaintiff protectively filed applications for DIB and SSI, in which she alleged her disability began on October 15, 2007. Tr. at 101, 102, 185–90, and

191–98. Her applications were denied initially and upon reconsideration. Tr. at 135–39, 140–44, 147–49, and 150–52. On July 29, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Tracy Daly. Tr. at 26–78 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 26, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–24. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 11, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 37 years old at the time of the hearing. Tr. at 23 and 24. She completed high school and one year of college and received certifications as a nursing assistant and a phlebotomist. Tr. at 33. Her past relevant work ("PRW") was as a nursing assistant, a phlebotomist, a dog groomer's assistant, and a cashier. Tr. at 74. She alleges she has been unable to work since October 15, 2007. Tr. at 31.

2.    Medical History

On July 25, 2007, Plaintiff presented to Cindy Reese, M.D. ("Dr. Reese"), with a complaint of acute pain in her right gluteal region. Tr. at 382. Dr. Reese indicated Plaintiff appeared uncomfortable and had some tenderness over her right greater trochanter, but had normal gait and range of motion ("ROM") and no joint instability. *Id.*

She prescribed Flexeril and Ultram and indicated she would refer Plaintiff to an orthopedist or physical therapist if her symptoms continued. Tr. at 383.

Plaintiff followed up with Dr. Reese on August 28, 2007, and complained of a recent onset of pain and burning in her right lateral thigh that was exacerbated by walking for an extended period. Tr. at 380. Dr. Reese observed Plaintiff to appear uncomfortable and to be tender over her right greater trochanter. *Id.* She administered a Kenalog injection and prescribed Lyrica and Vicodin. Tr. at 381.

Plaintiff underwent magnetic resonance imaging ("MRI") of her lumbar spine on September 20, 2007. Tr. at 310. Gilbert E. Parker, M.D. ("Dr. Parker"), interpreted the MRI to show a T11-12 central disc protrusion that deformed the anterior central thecal sac with protrusions centrally at L2-3 and L3-4 that contributed to spinal stenosis and deformed the anterior central thecal sac. *Id.* The MRI indicated no asymmetric herniation or exiting nerve root impingement. *Id.*

On September 25, 2007, Plaintiff reported continued pain in her right leg and lower back, but indicated Lyrica had provided some relief. Tr. at 378. Dr. Reese observed Plaintiff to have an abnormal gait, to be tender to palpation, and to demonstrate decreased ROM. Tr. at 379. She increased Plaintiff's dosage of Lyrica to 100 milligrams and refilled her prescription for Vicodin. *Id.*

Plaintiff presented to Paul D. DeHoll, M.D. ("Dr. DeHoll"), on October 18, 2007, complaining of a five-month history of numbness and burning in her anterior and lateral right thigh that had caused her to fall at work. Tr. at 282. She indicated her symptoms were exacerbated by standing and walking. *Id.* Dr. DeHoll observed Plaintiff to have no

3

swelling or erythema; to be nontender to palpation; to have no instability; to demonstrate normal muscle strength; to show normal ROM; to have normal and equal sensation bilaterally; to demonstrate normal reflexes; to have a normal straight-leg raising ("SLR") test; and to walk with a normal gait. *Id.* He interpreted the MRI of Plaintiff's lumbar spine to show moderate central disc protrusions at T11-12, L2-3, and L3-4, but to indicate no severe stenosis or nerve-root deflection. *Id.* He assessed neuralgia and lumbar disc displacement and referred Plaintiff for a lumbar epidural steroid injection ("ESI") at L2-3. Tr. at 283. He prescribed 150 milligrams of Lyrica to be taken twice a day and indicated he would refer Plaintiff for electromyography ("EMG") and nerve conduction studies ("NCS") of her right thigh if the lumbar ESI and increased dose of Lyrica were ineffective. *Id.*

On October 25, 2007, Plaintiff presented to the emergency room ("ER") at Tuomey Healthcare with back pain. Tr. at 302. A physical exam revealed no tenderness to palpation in Plaintiff's back; normal inspection of her back and lower extremities; no clubbing, edema, or calf tenderness; and normal ROM of her lower extremities. *Id.* Luis Muniz, M.D. ("Dr. Muniz"), diagnosed an acute exacerbation of chronic back pain and lumbosacral radiculopathy. Tr. at 305.

On October 30, 2007, Plaintiff reported to Dr. Reese that her medication was not helping and was making her "feel funny." Tr. at 376. Dr. Reese indicated Plaintiff was morbidly obese and appeared uncomfortable. *Id.* She noted Plaintiff walked with a deliberate and slow gait; was tender to palpation throughout her lumbar spine and over

her right greater trochanter; and had restricted ROM of her lumbar spine, secondary to pain. *Id.* She assessed spinal stenosis of the lumbar region and sciatica. *Id.*

Plaintiff presented to Michael Warrick, M.D. ("Dr. Warrick"), for a right-sided L2-3 transforaminal ESI on October 31, 2007. Tr. at 299. On November 8, 2007, she reported 20–30% overall improvement in her pain, but indicated the numbness and tingling in her right thigh had not improved. Tr. at 295. Dr. Warrick observed Plaintiff to have good ROM of her lumbar spine, a negative SLR test, normal lower extremity strength, intact sensation, and some mild decrease in sensitivity to light touch. *Id.* Plaintiff underwent transforaminal ESIs on November 12, 2007, and December 4, 2007. Tr. at 288 and 291. On December 4, Warrick observed Plaintiff to have normal lower extremity strength, intact sensation, normal reflexes, and a normal gait. Tr. at 288. He referred her back to Dr. DeHoll for additional treatment options. *Id.*

On December 28, 2007, Plaintiff requested that Dr. Reese refer her to another specialist for a second opinion. Tr. at 374. She reported excessive pain with standing that prevented her from being able to go shopping. *Id.* Dr. Reese indicated Plaintiff was morbidly obese and appeared uncomfortable. *Id.* She observed Plaintiff to ambulate with a slow and deliberate gait; to be tender throughout her lumbar spine; and to have restricted ROM, secondary to pain. Tr. at 375. Dr. Reese increased Plaintiff's dosage of Lyrica and referred her to Carolina Spine Institute for a second opinion. *Id.*

Plaintiff presented to Steven C. Poletti, M.D. ("Dr. Poletti"), on January 10, 2008, for pain in her low back. Tr. at 333–34. She indicated she had been out of work since October 26, 2007, and had been unable to do most activities of daily living ("ADLs"). Tr.

at 333. Dr. Poletti observed Plaintiff to have a straight spine; to have slightly diminished patellar tendon reflex on the right; and to have some dysesthesia in the posterior-lateral aspect of her hip and right leg. *Id.* He diagnosed a disc herniation at L3-4 and recommended another MRI of Plaintiff's lumbar spine. Tr. at 334.

Plaintiff followed up with Dr. Poletti on January 28, 2008. Tr. at 332. Dr. Poletti indicated Plaintiff's MRI revealed an increase in the herniation at the L3-4 level and showed her to have four levels of degenerative disc disease. *Id.* He recommended Plaintiff undergo ESI on the right and possible discogram, but indicated the MRI results did not suggest a need for immediate decompression surgery. *Id.*

On March 27, 2008, Plaintiff reported to Dr. Reese that the pain in her back and right leg had improved and that physical therapy was helping. Tr. at 372. However, she indicated her activity level and ability to lift remained limited. *Id.* Dr. Reese described Plaintiff as morbidly obese and indicated she appeared uncomfortable. Tr. at 373. She observed Plaintiff to be tender in her pelvis, right greater trochanter, and lumbar spine. *Id.* She indicated Plaintiff's lumbar ROM was limited by pain. *Id.* Dr. Reese stated Plaintiff was unlikely to be able to return to her prior job as a CNA. *Id.*

Plaintiff presented to the ER at Tuomey Healthcare on March 31, 2008, with complaints of lower abdominal pain, weakness, and fatigue. Tr. at 542. The attending physician diagnosed nonspecific lower abdominal pain and prescribed Phenergan. Tr. at 547.

On March 3, 2009, Plaintiff complained to Dr. Reese of continued pain in her lower lumbar area. Tr. at 369. She indicated that her right leg pain was exacerbated by

her attempts to shop. *Id.* She stated she was only using her pain medication on an as-needed basis. *Id.* Dr. Reese indicated Plaintiff appeared uncomfortable. *Id.* She observed the following on examination: pelvic tenderness; slow and deliberate gait; normal lumbar lordosis; tenderness throughout the lumbar area; restricted ROM of the lumbar spine; tenderness to palpation of the right greater trochanter; normal right lower extremity ROM; no right lower extremity joint instability; normal tone, bulk, and strength; and normal and symmetric deep tendon reflexes. Tr. at 370. She prescribed Diflucan, Lisinopril, Lyrica, Metformin HCL, Triamcinolone cream, and Vicodin. Tr. at 371.

On September 12, 2009, Plaintiff presented to the ER at Tuomey Healthcare, after having sustained a fall. Tr. at 511. She reported pain in her back, right wrist, and right ankle. Tr. at 511 and 523. The attending physician observed Plaintiff to demonstrate weakness in her bilateral lower extremities and to be tender in the midline of her low back and paraspinal area. Tr. at 512 and 514. He diagnosed right ankle and wrist sprains; prescribed Flexeril, Ultram, and Darvocet; applied a right ankle air splint and a right wrist splint; and instructed Plaintiff to follow up with Dr. Reese. Tr. at 514, 523, and 524.

Plaintiff followed up with Dr. Reese on September 15, 2009, and reported pain in her right ankle and wrist. Tr. at 367. Dr. Reese indicated Plaintiff appeared to be in pain and noted she was in a wheelchair. Tr. at 368. She observed Plaintiff to have scoliosis in her spine; to demonstrate tenderness throughout her lumbar area; to have markedly restricted ROM of her spine; to demonstrate bilateral lower extremity weakness; and to show soft tissue swelling in her right wrist. *Id.* Dr. Reese refilled Plaintiff's prescriptions

for Flexeril and Darvocet; advised her to return in two weeks for a possible referral to physical therapy; and instructed her to consider applying for disability. *Id.*

Plaintiff followed up with Dr. Reese on October 29, 2009. Tr. at 364. She complained of back pain and right leg weakness and requested a referral to physical therapy. *Id.* Dr. Reese observed that Plaintiff appeared uncomfortable. *Id.* She indicated Plaintiff had some pelvic tenderness; ambulated with a slow and deliberate gait; was tender throughout her lumbar area; had restricted ROM of her lumbar spine, secondary to pain; demonstrated tenderness to palpation over the greater trochanter; had normal right lower extremity ROM; demonstrated normal tone, bulk, and strength; and had normal and symmetric deep tendon reflexes. Tr. at 365. Dr. Reese prescribed Clobetasol cream, Darvocet-N, Flexeril, Loratadine, and Metronidazol and referred Plaintiff to physical therapy. Tr. at 365–66.

Plaintiff presented to the ER at Tuomey Healthcare on February 20, 2010, with complaints of shortness of breath and weakness. Tr. at 496. The attending physician diagnosed sinusitis and prescribed antibiotic medications. Tr. at 498.

On February 23, 2010, an MRI of Plaintiff's lumbar spine showed a protruding disc at L2-3 that deformed the anterior central thecal sac; a mild concentric disc bulge at L3-4; a central disc protrusion at L4-5 that deformed the anterior central thecal sac; and a minimal central disc protrusion at L5-S1. Tr. at 493.

On March 30, 2010, Plaintiff indicated to Dr. Reese that she pulled a muscle while putting food in the oven. Tr. at 357. She reported lumbar back pain, joint pain, joint stiffness in her right hip, weakness, numbness, and tingling. *Id.* Dr. Reese noted that

8

Plaintiff appeared uncomfortable. *Id.* She indicated Plaintiff ambulated with a slow and deliberate gait. Tr. at 358. She observed Plaintiff to demonstrate the following: pelvic tenderness; tenderness throughout her lumbar area; restricted lumbar ROM, secondary to pain; normal right lower extremity ROM; tenderness over the right greater trochanter; normal tone, bulk, and strength; no joint instability in the right lower extremity; and normal and symmetric deep tendon reflexes. *Id.* Dr. Reese assessed allergic rhinitis, lumbar back pain, benign essential hypertension, ovarian cyst, and Vitamin D deficiency and prescribed Darvocet-N, Flexeril, and Flonase. *Id.*

Plaintiff presented to Dr. Reese on August 31, 2010, for irregular vaginal bleeding, erratic menses, weakness, dizziness, and sinus pressure. Tr. at 355. Dr. Reese observed no abnormalities on examination and noted that Plaintiff had a euthymic mood and an appropriate affect. Tr. at 356. She diagnosed sinusitis and an ear infection; prescribed Amoxil, Cetirizine HCL, Flonase, Lisinopril, and Metformin HCL; and referred Plaintiff to Dr. Anderson for irregular menses and infertility. Tr. at 356.

On September 6, 2010, Plaintiff presented to the ER at Tuomey Healthcare with a complaint of left arm pain. Tr. at 469. She also reported chest pain, mild shortness of breath, vomiting, sweating, and feeling flushed. Tr. at 470. Plaintiff received an intravenous dose of Zofran. Tr. at 472. A workup was benign, and the attending physician released Plaintiff with instructions to follow up with her primary care provider. Tr. at 471.

Plaintiff presented to the ER at Tuomey Healthcare on September 23, 2010, complaining of a two-week history of abdominal pain and nausea. Tr. at 456. The

attending physician prescribed Phenergan and Pepcid and instructed Plaintiff to follow up with Dr. Reese. Tr. at 459.

Plaintiff followed up with Dr. Reese on September 27, 2010, and reported continued nausea and weakness. Tr. at 352. Dr. Reese observed Plaintiff to have a rash in the axillary region of her bilateral upper extremities, but noted no other abnormalities. Tr. at 353. She indicated Plaintiff's mood was euthymic and her affect was appropriate. *Id.* She advised Plaintiff that she would refer her for an upper gastrointestinal ("GI") series if her symptoms persisted and her stool culture was negative. *Id.* She prescribed Clotrimazole/Betameth cream and Diflucan for Plaintiff's rash. *Id.* A test for H. pylori infection was negative. *Id.*

Plaintiff presented to the ER at Tuomey Healthcare on November 6, 2010, for nausea and vomiting. Tr. at 440. She stated she had experienced GI problems over the past several months, but indicated her problems had worsened. Tr. at 443. Plaintiff's symptoms improved with medication and intravenous fluids, and the attending physician discharged her with instructions to follow up with her primary care provider. Tr. at 443–44.

On November 8, 2010, Plaintiff complained to Dr. Reese of a recent onset of persistent GI symptoms. Tr. at 350. She reported burning in her stomach, constipation, vomiting, weakness, shaking, weight loss, and poor appetite. *Id.* Dr. Reese observed Plaintiff to have a euthymic mood and appropriate affect and noted no abnormalities on examination. Tr. at 351. She prescribed Glycolax for constipation and Phenergan for nausea and referred Plaintiff for GI testing. *Id.*

10

Plaintiff presented to Scott R. McDuffie ("Dr. McDuffie"), for a GI examination on November 12, 2010. Tr. at 427–29. She complained of nausea and vomiting that occurred approximately 30 minutes after eating. Tr. at 427. She stated she had lost 25–30 pounds over the past two months. *Id.* Dr. McDuffie performed a colonoscopy and an esophagogastroduodenoscopy ("EGD") with biopsy and Campylobacter-like organism ("CLO") test. Tr. at 430. The testing showed gastritis and a normal-appearing terminal ileum, colon, and jejunum, but was negative for H. pylori infection. Tr.at 430, 432. The results were most consistent with irritable bowel syndrome ("IBS"). *Id.* Dr. McDuffie recommended weight reduction and a possible abdominal computed tomography ("CT") scan. Tr. at 429.

Plaintiff followed up with Dr. Reese on November 17, 2010. Tr. at 348–49. She indicated she felt like her GI symptoms were caused by anxiety from her mother's illness and her father's demanding nature. Tr. at 348. She stated she was eating a bland diet and was attempting to increase her exercise. *Id.* Dr. Reese indicated Plaintiff had a euthymic mood and an appropriate affect and observed no abnormalities on examination. Tr. at 349. She prescribed Buspirone HCL. *Id.*

On March 7, 2011, Plaintiff presented to Dr. Reese with complaints of increasing constipation, excessive gas, abdominal pain, and frequent episodes of vomiting. Tr. at 346. She reported anxiety that was increased by her GI problems. *Id.* Dr. Reese observed no abnormalities on examination and noted that Plaintiff had a euthymic mood and appropriate affect. Tr. at 347. She instructed Plaintiff to continue taking fiber and Zyrtec and to add Digestive Advantage Intensive Bowel Support and Flonase. *Id.*

Plaintiff followed up with Dr. Reese on June 23, 2011. Tr. at 343. She indicated her GI symptoms had improved, but complained of increased cough and congestion. Tr. at 344. Dr. Reese described Plaintiff's mood as euthymic and her affect as appropriate. *Id.* She noted no abnormalities on examination. *Id.*

On January 4, 2012, Plaintiff presented to Dr. Reese for an evaluation of left-sided pain in her back and flank and swelling in her legs Tr. at 340. She indicated her activity was limited by her pain and that she had recently been under a lot of stress as a result of her mother's illness. *Id.* Dr. Reese indicated Plaintiff demonstrated a euthymic mood and appropriate affect and noted no abnormalities on examination. Tr. at 341. She administered a Depo-Medrol injection in Plaintiff's left gluteal muscle. *Id.*

On July 14, 2012, Dr. Reese indicated she had diagnosed Plaintiff with generalized anxiety disorder and prescribed Alprazolam and Buspirone. Tr. at 400. She described Plaintiff as being oriented to time, person, place, and situation; having intact thought processes; showing appropriate thought content; demonstrating a worried/anxious mood/affect; having adequate attention/concentration; and showing adequate memory. *Id.* She described Plaintiff as demonstrating obvious work-related limitation due to a mental condition. *Id.*

On August 27, 2012, state agency consultant Samuel Goots, Ph. D. ("Dr. Goots"), reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 84–85. He considered Listing 12.06 for anxiety-related disorders, but determined Plaintiff had no restriction of ADLs; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of

decompensation. *Id.* Dr. Goots concluded Plaintiff's mental condition was not severe. Tr. at 85. On October 26, 2012, Dr. Goots reviewed the evidence again and concluded it was insufficient to substantiate the presence of an anxiety-related disorder. Tr. at 94.

Plaintiff presented to James E. Gee, M.D. ("Dr. Gee"), for a comprehensive orthopedic examination on September 19, 2012.[1] Tr. at 402–04. She complained of pain that radiated from her lumbosacral area into her bilateral lower extremities. Tr. at 402. She indicated her pain was aggravated by sitting and walking for prolonged periods, bending, lifting, squatting, and most movements. *Id.* Dr. Gee stated Plaintiff was 5'5" tall and weighed 326 pounds. Tr. at 403. He indicated Plaintiff did not appear to be in distress, but had some difficulty getting up in the chair, to the examining table, and turning on the examining table. *Id.* Plaintiff complained of pain at 15 degrees of flexion, five degrees of extension, and 10 degrees of lateral flexion[2] and was able to squat only 10 percent. *Id.* Dr. Gee noted Plaintiff could heel, toe, and tandem walk; had a negative SLR test; had brisk and equal deep tendon reflexes; demonstrated good motion of her lower extremities; and had intact motor, sensory, and vascular examinations. *Id.* He assessed morbid obesity, probable degenerative and mechanical back pain without definite objective findings on physical examination, and anxiety. Tr. at 404. After reviewing x-rays of Plaintiff's lumbosacral spine, Dr. Gee indicated Plaintiff had a little narrowing of L5-S1 and very mild anterior spurring at L3. *Id.* He stated he lacked any reports or

---

[1] Dr. Gee specifically noted that the records provided to him were "inadequate" and that he had no records documenting any of Plaintiff's treatment for or evaluations of her back pain or anxiety. Tr. at 402.
[2] Normal range of the lumbar spine is to 90 degrees of flexion, 25 degrees of extension, and 25 degrees of lateral flexion. Tr. at 405.

interpretations of Plaintiff's lumbar MRI, but that his opinion was unchanged after reviewing the MRI on the computer. *Id.*

Plaintiff reported pain in her lower back, hips, and legs on October 25, 2012. Tr. at 626. She also complained of nasal congestion, cough, and dyspnea. *Id.* Dr. Reese observed Plaintiff to have red and swollen nasal turbinates; scattered rhonchi and wheezes throughout her lungs; and to be anxious and have a flat affect. Tr. at 626. She diagnosed acute bronchitis and prescribed a Medrol Dosepak. Tr. at 627.

On October 25, 2012, state agency physician Tom Brown, M.D. ("Dr. Brown"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment. Tr. at 95–97. He indicated Plaintiff had the following limitations: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for two hours; sit for about six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation; and avoid all exposure to hazards. *Id.*

Plaintiff was hospitalized at Tuomey Healthcare from October 28 to October 30, 2012. Tr. at 566. Plaintiff's oxygen saturation was normal throughout her hospitalization, but her blood pressure was initially as high as 205/103. Tr. at 567. Her discharge diagnoses included acute dyspnea, likely secondary to bronchitis and bronchospasm; anxiety/hyperventilation; urgent hypertension; morbid obesity; allergic rhinosinusitis; gastroesophageal reflux disease ("GERD"); borderline elevated brain natriuretic peptide

14

with negative CT of the chest and no clinical findings consistent with congestive heart failure; and chronic back pain. Tr. at 566. Dr. Reese instructed Plaintiff to maintain a low-sodium, weight-reduction diet; to alternate Combivent and Albuterol inhalers; to continue taking over-the-counter Zyrtec and Mucinex for sinus problems; and to gradually increase her activity level. *Id.*

Plaintiff reported improved symptoms to Dr. Reese on November 14, 2012. Tr. at 624. She indicated she had started walking again and had not required her inhaler over the past few days. *Id.* Dr. Reese instructed Plaintiff to continue her medications and to follow up in three months. Tr. at 625.

On February 6, 2013, Plaintiff complained of a painful boil under her left axilla. Tr. at 635. Dr. Reese excised and drained the abscess, which was positive for methicillin-resistance staphylococcus aureus ("MRSA"). *Id.* She diagnosed cellulitis and prescribed Doxycycline Hyclate. *Id.*

On March 30, 2013, Dr. Reese indicated that Plaintiff's diagnoses included depression and anxiety. Tr. at 638. She stated Plaintiff's condition had improved with use of 10 milligrams of Buspirone twice a day. *Id.* She indicated Plaintiff was oriented to time, person, place, and situation; had an intact thought process; had appropriate thought content; had a worried/anxious mood/affect; had adequate attention and concentration; and demonstrated poor memory. *Id.* She assessed Plaintiff to have obvious work-related limitation in function as a result of her mental condition, but stated Plaintiff was able to manage her funds. *Id.*

On April 4, 2013, state agency medical consultant Manhal Wieland, Ph. D. ("Dr. Wieland"), completed a PRTF. Tr. at 110–11. Dr. Wieland considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 110. He assessed Plaintiff as having mild restriction of ADLs; mild difficulties in maintain social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. *Id.* He determined Plaintiff's mental conditions were not severe. *Id.*

State agency medical consultant Robert Kukla, M.D. ("Dr. Kukla"), reviewed the evidence and assessed Plaintiff's RFC on April 8, 2013. Tr. at 112–14. He indicated Plaintiff could occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of two hours; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, and stoop; and never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds.

On June 6, 2013, Plaintiff reported that she had experienced an exacerbation of her back pain over the prior month. Tr. at 656. She indicated her leg pain interrupted her sleep and that she experienced burning and tingling in her leg if she attempted to walk for too long. *Id.* Plaintiff also complained of sinus drainage and boils under her arms. *Id.* Dr. Reese observed that Plaintiff was "anxious appearing," but noted no other abnormalities on examination Tr. at 656–57. She indicated lab work showed Plaintiff's Ferritin to be low and she instructed Plaintiff to take an iron supplement. Tr. at 657. She refilled Plaintiff's other medications and prescribed Tizanidine HCl for Plaintiff's leg pain,

Fexofenadine HCl for her allergy and sinus symptoms, and Doxycycline for the boils under her arms. Tr. at 657 and 658.

Plaintiff followed up with Dr. Reese for shortness of breath and wheezing on August 12, 2013. Tr. at 661. She indicated she had felt ill for three weeks and was experiencing significant stress as a result of her mother's poor health. *Id.* She complained of difficulty sleeping, increased urinary urgency and bladder pressure, back pain, and a pins-and-needles sensation in her feet. *Id.* She stated she had some Clonazepam left over from when Dr. Reese prescribed it the year before. *Id.* Dr. Reese observed Plaintiff to have pale and swollen nasal turbinates and to appear anxious. Tr. at 661–62. She referred Plaintiff to Charles H. White, Jr., M.D. ("Dr. White"), for evaluation of dyspnea and wheezing and prescribed ProAir HFA solution and a Medrol Dosepak. Tr. at 662.

On September 16, 2013, Plaintiff complained to Dr. White of dyspnea, exercise intolerance, fatigue, cough, and wheezing. Tr. at 640. She denied lightheadedness, palpitations, weakness, orthopnea, chest pain, chest tightness, and choking sensation. *Id.* She stated her symptoms were exacerbated by walking, climbing stairs, coughing, allergen exposure, and stress. *Id.* Dr. White performed a comprehensive physical examination that revealed no abnormalities, aside from morbid obesity. Tr. at 641–43. He indicated a need to rule out asthma; referred Plaintiff for several tests; prescribed Symbicort and Atrovent; and instructed her to follow up in four weeks. Tr. at 643. He stated Plaintiff's restrictive lung disease likely resulted, in part, from her weight. *Id.*

Plaintiff underwent nocturnal pulse oximetry testing on September 20, 2013, that showed no significant episodes of oxygen desaturation during sleep. Tr. at 644. On

October 10, 2013, an x-ray of Plaintiff's chest was negative. Tr. at 645. On November 19, 2013, a pulmonary exercise stress test showed no significant oxygen desaturation with exercise, but Dr. White observed Plaintiff to have mild dyspnea and fatigue. Tr. at 646. Plaintiff walked at an adequate pace and tolerated the test well. Tr. at 647. Pulmonary function testing yielded normal results on December 2, 2013. Tr. at 650–51.

On March 20, 2014, Plaintiff presented to Dr. Reese for an exacerbation of pain in her low back that was extending into her legs. Tr. at 664. She stated she had been unable to get out of bed for three weeks, but had noticed some improvement after taking muscle relaxers. *Id.* Dr. Reese observed Plaintiff to have pale and swollen nasal turbinates and to appear anxious, but noted no other abnormalities on examination. Tr. at 664–65. She referred Plaintiff to physical therapy, prescribed Promethazine and Nystatin-Triamcinolone cream, and refilled her other prescriptions. Tr. at 665 and 666.

On June 16, 2014, Dr. Reese completed a questionnaire regarding Plaintiff's RFC. Tr. at 674–79. She stated she had treated Plaintiff every three to six months since 2004. Tr. at 674. She indicated Plaintiff's diagnoses included sciatica, degenerative lumbar disc disease, morbid obesity, and asthma. *Id.* She assessed Plaintiff's prognosis as "poor." *Id.* She stated Plaintiff's symptoms included severe pain in her low back and legs, limited mobility, dyspnea, fatigue, and abdominal pain. *Id.* She indicated Plaintiff experienced severe low back that radiated into her legs. *Id.* She identified objective signs of Plaintiff's impairments that included reduced ROM, impaired sleep, abnormal gait, muscle spasm, and positive SLR test. *Id.* She denied that Plaintiff was a malingerer or that emotional factors contributed to the severity of her symptoms and functional limitations. Tr. at 675.

However, she stated Plaintiff's physical condition was affected by anxiety. *Id.* She indicated Plaintiff's pain or other symptoms were constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks. *Id.* She stated Plaintiff was capable of low stress jobs. *Id.* Dr. Reese identified no side effects from Plaintiff's medications that would affect her ability to work. *Id.* She indicated Plaintiff's symptoms had lasted or would be expected to last for at least 12 months. Tr. at 676. She estimated Plaintiff could walk for less than one city block without rest; could sit for 30 minutes at a time; could stand for 10 minutes at a time; could stand and walk for less than two hours during an eight-hour day; could sit for about four hours during an eight-hour day; would need periods of walking around during an eight-hour workday; would need a job that permitted shifting positions at will from sitting, standing, or walking; would need to take unscheduled breaks to lie down for 15 minutes during every 30–60 minute period; would not require elevation of her legs; would not require use of a cane or other assistive device; could rarely lift less than 10 pounds; could never lift 10 pounds or more; could never twist, stoop (bend), crouch/squat or climb ladders; and could rarely climb stairs. Tr. at 676–78. Although Dr. Reese indicated Plaintiff had no significant limitations with reaching, handling, or fingering, she estimated Plaintiff could only use her hands to grasp, turn, twist, or finely manipulate objects 25% of the time and could only use her arms to reach less than 10% of the time. Tr. at 678. She stated Plaintiff's impairment was likely to produce good and bad days and estimated Plaintiff would be absent from work as a result of her impairments or treatment on more than four

days per month. *Id.* Finally, she indicated she did not feel that Plaintiff was capable of completing a full-time work schedule at any level of exertion. Tr. at 679.

Plaintiff presented to the ER at Tuomey Healthcare on October 10, 2013, for shortness of breath. Tr. at 680. A chest x-ray was normal. Tr. at 681.

C.    The Administrative Proceedings

   1.    The Administrative Hearing

      a.    Plaintiff's Testimony

At the hearing on July 29, 2014, Plaintiff testified she was 5'6" tall and weighed 355 pounds. Tr. at 34. She endorsed pain in her lower back that she rated as a six out of 10 on a typical day. Tr. at 44–45. She indicated her back pain was exacerbated by sitting or standing for too long and by lifting. Tr. at 45. She stated her pain radiated from her back to her hips and legs. Tr. at 50 and 59. Plaintiff testified her impairments included sciatica, IBS, polycystic ovarian syndrome, and breathing problems. Tr. at 51 and 54. She indicated her weight exacerbated her back problems. Tr. at 54. She stated it was difficult to get up and down and to bend over. *Id.* She indicated she was being treated for anxiety. Tr. at 56. She endorsed racing thoughts and indicated her anxiety symptoms were triggered by crowds and confined spaces. Tr. at 57.

Plaintiff testified her medications caused her to experience dizziness and sleepiness five or six times per day and to lie down six times a day for one hour at a time. Tr. at 42–43. She indicated she had complained of these side effects to Dr. Reese during past visits. *Id.* She stated she had used a cane to balance for approximately a year. Tr. at 48. She indicated she also used a walker. Tr. at 61. She indicated her doctor was aware of

her use of the cane and walker, but had not prescribed them. Tr. at 48–49 and 61. She stated she used the cane outside of her home and ambulated inside her home with a walker on her worst days. Tr. at 61.

Plaintiff estimated she could stand for 15 minutes and sit for 15 minutes at a time. Tr. at 45. She stated she could engage in combined sitting and standing for 30 to 45 minutes before she would need to lie down for an hour. Tr. at 46. She indicated she could lift no more than 10 pounds. Tr. at 59. She testified she had to visit the restroom every 30 to 45 minutes because of symptoms of IBS. Tr. at 52. She stated she experienced vomiting once or twice a day. Tr. at 52. She indicated her symptoms were worse on three days per week and necessitated that she remain in bed all day. Tr. at 49. She stated her pain was reduced by lying down and her anxiety was reduced by reading. Tr. at 60.

Plaintiff testified she had a valid driver's license, but indicated she only drove once or twice a week for approximately five minutes at a time. Tr. at 58. She stated she watched television while she was sitting up. Tr. at 60. She indicated she enjoyed attending church, but was only able to do so once a month because of her pain. Tr. at 60–61. She denied engaging in household chores, vacuuming, and doing laundry. Tr. at 62. She stated she did some cooking, but indicated she alternated between sitting in her walker and standing while preparing the meal. Tr. at 62 and 64. She testified she visited the store with her husband once a month. Tr. at 65. She indicated she would use a motorized cart if the trip required she walk for more than 15 minutes. *Id.* She stated she walked around her house, but indicated it was difficult for her to exercise outside of her home because she had difficulty descending the stairs to her yard. Tr. at 66. She stated

she had not walked for exercise in three to four years. Tr. at 67. She indicated she had not

socialized with friends in two to three years. Tr. at 68. She stated she last went out to

dinner with her husband six months earlier. *Id.* She indicated her father visited her four

times a week. Tr. at 69. Plaintiff testified she had difficulty sleeping and estimated that

she slept for four to six hours per night. Tr. at 66–67.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Robert Brabham, Jr., reviewed the record and testified

at the hearing. Tr. at 73. The VE categorized Plaintiff's PRW as a nursing assistant as

medium with a specific vocational preparation ("SVP") of four; a phlebotomist as light

with an SVP of three; a dog groomer's assistant as medium with an SVP of four; and a

cashier as light with an SVP of three. Tr. at 74. The ALJ described a hypothetical

individual of Plaintiff's vocational profile who could perform work at the sedentary

exertional level that allowed her to alternate between sitting and standing at 30-minute

intervals throughout the workday without leaving the work station or being off task. Tr. at

74–75. The individual was further limited to occasional climbing of ramps or stairs,

balancing, and stooping; no crouching, kneeling, crawling, or climbing of ladders, ropes,

or scaffolds; and was required to avoid even moderate exposure to hazardous machinery

and unprotected heights. Tr. at 75. The VE testified that the hypothetical individual

would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any

other jobs in the regional or national economy that the hypothetical person could perform.

*Id.* The VE identified sedentary jobs with an SVP of two as a machine tender, *Dictionary*

*of Occupational Titles* ("*DOT*") number 731.685-014, with 7,000 positions in the state

22

economy and in excess of 275,000 positions nationally; an assembler, *DOT* number 739.684-094, with 8,000 positions in the state economy and in excess of 350,000 positions nationally; and an order clerk, *DOT* number 209.567-014, with 500 positions in the state economy and in excess of 20,000 positions nationally. Tr. at 75–76.

The ALJ next asked the VE to assume the same limitations in the first hypothetical question, but to further assume the individual would require the following additional limitations: to alternate between sitting and standing positions at approximately 15-minute intervals throughout the day without being off task or leaving the work station; a 15-minute break each hour, in addition to regularly scheduled breaks; and four unscheduled absences per month. Tr. at 76. He asked the VE if the individual could perform any jobs with those limitations. *Id.* The VE indicated the limitations were inconsistent with gainful employment at any skill or exertional level. *Id.*

## 2.    The ALJ's Findings

In his decision dated September 26, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.
2.    The claimant has not engaged in substantial gainful activity since October 15, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease and morbid obesity (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work

23

as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, the claimant is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently. She can sit for 6 hours in an 8-hour day and stand and walk for at least two hours in an eight-hour workday. The claimant requires the ability to alternate between sitting and standing positions every thirty minutes throughout the day without leaving the workstation and without being off task. The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can occasionally balance and stoop but never kneel, crouch, or crawl. The claimant is limited to no more than moderate exposure to hazardous machinery and unprotected heights.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on May 14, 1977 and was 30 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 14–24.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ incorrectly determined that Plaintiff's degenerative disc disease did not meet the requirements for a finding of disability under Listing 1.04;

2)    the ALJ failed to assess IBS, COPD, and anxiety among Plaintiff's severe impairments;

3)      the ALJ did not properly evaluate Plaintiff's subjective reports of pain and other symptoms;

4)      the ALJ incorrectly concluded that Plaintiff's severe impairments would allow her to alternate sitting and standing every 30 minutes during an eight-hour day; and

5)      the ALJ wrongly found that Plaintiff could perform work that required exposure to hazardous machinery and unprotected heights.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Listing 1.04

Plaintiff argues the ALJ erred in determining that her impairments did not meet the requirements for a finding of disability under Listing 1.04. [ECF No. 10 at 7]. She maintains the ALJ incorrectly concluded that the record contained no evidence of significant herniation, stenosis, or nerve root impingement with focal neurological deficits. *Id.* She contends the ALJ failed to consider her back pain in combination with her obesity in assessing the applicability of the Listing. *Id.* at 9.

The Commissioner argues the ALJ considered Plaintiff's degenerative disc disease alone and in combination with her obesity in determining whether her impairments were disabling under Listing 1.04. [ECF No. 11 at 12]. She maintains Plaintiff's impairments did not meet all the requirements of Listing 1.04. *Id.* at 13–16.

"A claimant is entitled to a conclusive presumption that he is disabled if he can show that his disorder results in compromise of a nerve root or the spinal cord." *Henderson v. Colvin*, 643 F. App'x 273, 276 (4th Cir. 2016). "Listing 1.04(A) further describes the criteria a claimant must meet or equal to merit a conclusive presumption of disability arising out of compromise of a nerve root or the spinal cord: evidence of nerve root compression characterized by (1) neuro-anatomic distribution of pain, (2) limitation of motion of the spine, (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, (4) positive straight leg raising test (sitting and supine)." *Id.*; *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(A). The court emphasized that the claimant bears the burden of demonstrating that her impairment or impairments meet or equal the Listing. *Id.*, citing *Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986); *see also Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) ("At the third step, the burden remains on the claimant, *see Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995), and he can establish his disability if he shows that his impairments match a listed impairment, *see Mascio*, 780 F.3d at 634–35.[5]").

The ALJ considered whether Plaintiff's impairment or combination of impairments met Listing 1.04, but found that they did not because "[d]iagnostic and clinical findings failed to reveal any significant herniations, stenosis, or nerve root impingement with focal neurological deficits." Tr. at 17. In discussing Plaintiff's RFC, the ALJ noted "there was no definitive pathology to suggest nerve compression or require

---

[5] The full citation for this case is *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015).

decompression surgery." Tr. at 18. He observed that the record contained no evidence of instability and that motor examinations revealed normal tone, bulk, and strength. *Id.* He indicated a SLR test was negative in April 2009. *Id.* He acknowledged that in February 2010, Plaintiff denied paresthesias and extremity weakness and had strong pulses in her lower extremities. Tr. at 18–19. He noted that the consultative examination showed Plaintiff to have a negative SLR test and intact motor, vascular, and sensory examinations. Tr. at 19. He considered Plaintiff's obesity in combination with her spinal condition, but observed that the consultative physician indicated Plaintiff's "motion was good considering her obesity" and that "[t]here was no evidence of weakness or atrophy." *Id.*

The undersigned recommends the court find the evidence supported the ALJ's conclusion that Plaintiff's impairments did not meet or equal Listing 1.04. Although the ALJ concluded that Plaintiff did not meet Listing 1.04 in a somewhat perfunctory manner at step three, a review of the decision as a whole shows that he thoroughly considered and cited the evidence of record that supported his conclusion. He indicated the imaging reports did not suggest Plaintiff had nerve root compression, and his conclusion was supported by the record. *See* Tr. at 18; *see also* Tr. at 282 and 310 (a September 2007 MRI indicated moderate central disc protrusions at T11-12, L2-3, and L3-4, but Drs. Parker and DeHoll indicated the MRI showed no signs of nerve root impingement), 332 and 554 (a January 2008 MRI indicated an increase in the herniation at the L3-4 level with deformity to the thecal sac and four levels of degenerative disc disease, but no nerve root impingement), and 493 (a February 2010 MRI showed several disc protrusions that

deformed the thecal sac, but did not suggest compromise of a nerve root or the spinal cord).

In *Henderson*, 643 F. App'x at 276, the Fourth Circuit found that the ALJ properly determined the plaintiff did not have the prerequisite findings of nerve root compression, including motor loss accompanied by sensory or reflex loss and noted that the plaintiff "produced no evidence of atrophy, and his evidence of muscle weakness—a lone clinical finding that his leg strength was '4+/5'—fails to undercut the substantial conflicting evidence in the record that his strength was consistently '5/5,' 'stable,' or 'normal.'" *Id.* Thus, the court found that the ALJ's conclusion that the plaintiff did not meet Listing 1.04 was supported by substantial evidence where the totality of the evidence showed Plaintiff to lack the mandatory signs for a finding of disability under Listing 1.04. *Id.*

In the instant case, the ALJ's determination that Plaintiff lacked the required signs for a finding of disability under Listing 1.04 is supported by the evidence. The ALJ indicated the record showed Plaintiff to have no motor, sensory, or reflex loss and to have negative SLR tests.[6] Tr. at 18–19; *see also* Tr. at 282 (normal reflexes and strength and negative SLR test), 288 (normal strength and reflexes and intact sensation), 291 (normal strength, intact sensation, and negative SLR test), and 403 (intact motor and sensory examinations, brisk and equal deep tendon reflexes, and negative SLR test). The ALJ also considered Plaintiff's obesity in combination with her spinal problems, but indicated the

---

[6] Although Dr. Reese indicated in her June 2014 RFC assessment that her opinion was supported by Plaintiff's positive SLR test, the medical evidence routinely showed Plaintiff to have negative SLR tests and contains no treatment notes that document positive SLR tests. *Compare* Tr. at 674, *with* Tr. at 282, 295, and 403.

evidence showed her to have no atrophy or weakness (Tr. at 19)—requirements for a finding of disability under Listing 1.04. In light of the court's holding in *Henderson*, the explanation offered by the ALJ, and evidence of record, the ALJ properly determined Plaintiff's impairments—considered both singularly and in combination—were not severe enough to be considered disabling under Listing 1.04.

2.    Severe Impairments

Plaintiff argues the ALJ erred in failing to assess IBS, COPD, and anxiety as severe impairments. [ECF No. 10 at 9]. She maintains the ALJ focused only on the evidence that supported his findings that IBS, COPD, and anxiety were non-severe impairments and ignored the evidence to the contrary. *Id.* at 10.

The Commissioner argues the ALJ considered Plaintiff's IBS, pulmonary condition, and anxiety at step two and provided sufficient reasons for determining they were non-severe impairments. [ECF No. 11 at 10–12]. She contends the evidence does not show that Plaintiff's IBS or COPD resulted in significant functional limitations. *Id.* She maintains the ALJ accounted for the residual effects of Plaintiff's COPD in limiting her to no more than moderate exposure to hazardous machinery and unprotected heights. *Id.* at 11. She further argues the ALJ's assessment of Plaintiff's anxiety as non-severe was supported by the fact that Plaintiff was prescribed a low dose of medication and did not require treatment from a mental health specialist. *Id.* at 11.

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight

abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.[7]").

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

To adequately assess an individual's RFC, the ALJ must determine the limitations imposed by her impairments and how those limitations affect her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The

---

[7] Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

a.      IBS

The ALJ acknowledged that Plaintiff had intermittent presentations to medical providers for GI symptoms, but that she improved with medication and fiber. Tr. at 15. He indicated the diagnostic testing was negative and that Plaintiff had no further evidence of uncontrolled weight loss or failure to thrive after she was diagnosed with IBS and prescribed medication. *Id.*

The ALJ's finding that IBS was a nonsevere impairment was consistent with the medical evidence of record. The record reflects that Plaintiff first presented to the ER at Tuomey Healthcare with complaints of abdominal pain and nausea on September 23, 2010, and reported that her symptoms had begun two weeks earlier. Tr. at 456. She continued to report GI symptoms on September 27, 2010 (Tr. at 352), November 6, 2010

(Tr. at 440), and November 8, 2010 (Tr. at 350). Dr. Reese referred her to Dr. McDuffie, who diagnosed IBS after a comprehensive series of diagnostic tests showed no abnormalities. Tr. at 427–29, 430, 432. On November 17, 2010, Plaintiff indicated to Dr. Reese that she felt like her anxiety exacerbated her GI symptoms, and Dr. Reese prescribed Buspirone for anxiety. Tr. at 348–49. Plaintiff reported increased GI symptoms to Dr. Reese in March 2011, and Dr. Reese advised her to add Digestive Advantage Intensive Bowel Support and to continue taking fiber. Tr. at 346–47. In June 2011, Plaintiff indicated to Dr. Reese that her GI symptoms had improved (Tr. at 344), and subsequent medical records show no complaints of GI symptoms.

Although the ALJ's conclusion was consistent with the medical evidence regarding Plaintiff's diagnosis of IBS, it failed to reflect any consideration of Plaintiff's statements about the limiting effects of the impairment. Plaintiff wrote in a disability report that she experienced nausea and vomiting and required several bathroom trips during the day as a result of symptoms of IBS. Tr. at 241. She testified she experienced vomiting episodes once or twice a day and had to visit the restroom every 30 to 45 minutes because of symptoms of IBS. Tr. at 52–53. While the ALJ could have reasonably concluded that Plaintiff's statements were inconsistent with the absence of uncontrolled weight loss and reports of symptoms to her physician after June 2011, he made no such finding. Therefore, the ALJ did not adequately assess the severity of Plaintiff's IBS and its limiting effects in light of her statements.

b.      COPD

The ALJ acknowledged that Plaintiff had presented to medical providers and was hospitalized for shortness of breath as a result of acute bronchitis, but noted that Plaintiff's symptoms improved with medication and that pulmonary testing showed no acute abnormality. Tr. at 15. He stated "[o]verall, there was no evidence of a respiratory condition that would cause more than minimal functional limitations." Tr. at 15. The ALJ noted that Plaintiff "had some mild perceived dyspnea and fatigue when performing a pulmonary exercise test," but had 97–98% oxygen saturation during and after testing. Tr. at 19. Thus, the ALJ essentially found that Plaintiff had no medically-determinable pulmonary impairment.

The undersigned recommends the court find the ALJ's determination that Plaintiff had no severe pulmonary impairment is supported by substantial evidence. ALJs may not rely on a claimant's report of symptoms without record evidence of medical signs and laboratory findings that demonstrate the existence of a medically-determinable impairment that could reasonably cause the reported symptoms. SSR 96-7p. As the ALJ recognized, the diagnostic testing is not consistent with a diagnosis of COPD. *See* Tr. at 15, 19; *see also* Tr. at 644 (nocturnal pulse oximetry testing showed no significant episodes of oxygen desaturation during sleep), 646 (a pulmonary exercise stress test showed no significant oxygen desaturation with exercise) and 650–51 (pulmonary function testing showed normal pulmonary function). Although Plaintiff complained of shortness of breath as a result of walking, climbing stairs, coughing, allergen exposure, and stress, Dr. White opined that her alleged symptoms resulted from her weight, as

opposed to a pulmonary condition. Tr. at 640–43. While Plaintiff had mild dyspnea and fatigue during the pulmonary exercise stress test, she had no significant oxygen desaturation, walked at an adequate pace, and generally tolerated the test well. Tr. at 646–47. In addition, Plaintiff did not allege any limitations as a result of breathing problems in the function report or disability reports. *See generally* Tr. at 233–43, 254–58, and 267–74. Although Plaintiff indicated in her testimony she experienced shortness of breath and used two inhalers, she did not indicate that her breathing difficulties were exacerbated by any work-related functions. *See* Tr. at 55–56. In light of a record that contains no objective evidence to support a diagnosis of COPD and that suggests Plaintiff's breathing problems resulted from obesity, and in the face of evidence that the ALJ considered obesity to be a severe impairment and assessed restrictions accordingly,[8] the undersigned recommends the court find the ALJ did not err in failing to assess COPD as a severe impairment.

### c.    Anxiety

The ALJ determined Plaintiff's anxiety caused no more than minimal limitation in her ability to perform basic mental work activities. *Id.* He indicated Plaintiff's anxiety symptoms were associated with social stressors; were effectively treated with a low dosage of Buspirone that was not increased over time; required no formal mental health treatment; and resulted in no periods of decompensation or hospitalizations. Tr. at 15–16. He determined Plaintiff had mild limitation in ADLs, mild limitation in social

---

[8] The ALJ found that Plaintiff's obesity limited her stamina and exertional abilities in lifting, standing, and walking. Tr. at 19.

functioning, and mild limitation in concentration, persistence, or pace. Tr. at 16. The ALJ stated that he considered Dr. Reese's opinion that Plaintiff had a worried mood and affect; adequate to poor memory; and obvious work-related limitations in function secondary to anxiety. Tr. at 21. However, he indicated he gave it little weight because Dr. Reese's treatment records "failed to reflect any deficits in mental health that were not adequately addressed with the conservative treatment she provided to the claimant," as evidenced by her failure to refer Plaintiff for formal mental health counseling or management, the absence of inpatient hospitalizations or periods of decompensation, and a lack of significant adjustments to Plaintiff's anxiety medications. *Id.* He stated he gave great weight to the state agency consultants' opinions that Plaintiff's anxiety was a non-severe impairment because their opinions were consistent with the record. Tr. at 22.

Although the ALJ cited multiple reasons to support his conclusion that Plaintiff's anxiety was a non-severe impairment, it appears that he did not adequately consider Plaintiff's statements regarding its limiting effects. Plaintiff testified that her symptoms of anxiety were triggered by crowds and being in confined spaces. Tr. at 57. She stated she experienced racing thoughts and had some problems with her memory. *Id.* While the ALJ could have reasonably concluded that Plaintiff's statements were inconsistent with the medical evidence of record regarding her anxiety, he did not make this specific finding, but instead neglected to specifically consider the functional limitations Plaintiff alleged at step two and in assessing her RFC.

3.    Subjective Allegations of Pain

Plaintiff argues the ALJ did not adequately evaluate her subjective allegations of pain and functional limitations. [ECF No. 10 at 11–12]. She maintains her treating physician's opinion corroborated her testimony. *Id.* at 12.

The Commissioner argues the ALJ properly evaluated Plaintiff's credibility, in accordance with the applicable regulations. [ECF No. 11 at 20]. She maintains the ALJ based his determination that Plaintiff's testimony was not entirely credible on inconsistencies between her testimony and the other evidence of record. *Id.* at 20–21. She contends the ALJ adequately explained his reasons for granting little weight to Dr. Reese's opinion. *Id.* at 21–22.

In considering symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, the ALJ should first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p.[9] After determining that the individual has a medically-determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of her symptoms to determine the limitations

---

[9] The undersigned notes that the Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, the undersigned analyzes the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility.

they impose on her ability to do basic work activities. *Id.* If the individual's statements about the intensity, persistence, or limiting effects of her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the individual's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the following when assessing the credibility of an individual's statements:

1.     The individual's ADLs;

2.     The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.     Factors that precipitate and aggravate the symptoms;

4.     The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.     Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.     Any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.     Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*

The ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* In *Mascio*, 780 F.3d at 639–40, the court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence in the record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ considered Plaintiff's testimony that she had significant inactivity and an inability to travel or socialize, but indicated this was contradicted by her reports of attending to sick family members, traveling out of town, and walking for exercise. Tr. at 20. He considered Plaintiff's allegation of difficulty sleeping, but found it was undermined by the results of her sleep test. *Id.* He found that Plaintiff's allegations of severe daily back pain were inconsistent with the medical records that "reflected only occasional reports of flares of back pain and leg burning/tingling with prolonged walking." *Id.* He stated Plaintiff's claim that her doctor was aware of and supported her use of a cane for ambulation was "not readily supported" or documented in the treatment records. *Id.* He indicated Plaintiff's reports to her physicians failed to substantiate her allegations of side effects from medications that included dizziness and sleepiness that occurred about six times per day. Tr. at 20–21.

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning their intensity, persistence, and limiting effects were not entirely credible. Tr. at 18. He determined that Plaintiff's lumbar spine condition improved with conservative treatment. *Id.* He noted that Plaintiff reported improvement in her back and right leg symptoms in March 2008 and declined to pursue further follow up with specialists and more invasive treatment. *Id.* He found that Plaintiff's back pain was managed by her primary care provider, with only intermittent exacerbations in her pain level. Tr. at 19.

The ALJ considered Dr. Reese's opinions regarding Plaintiff's physical and mental limitations, but found her opinions were not supported by the record. Tr. at 21. He indicated Dr. Reese's opinion regarding Plaintiff's anxiety was inconsistent with the minimal nature of the treatment she provided to Plaintiff for anxiety, the nonexistence of inpatient hospitalizations and periods of decompensation, the absence of adjustments to Plaintiff's medications, and her failure to refer Plaintiff for mental health counseling or management. *Id.* He stated Dr. Reese's assessment of Plaintiff's physical limitations was inconsistent with clinical findings on examinations and diagnostic findings. *Id.* He specified that SLR tests were consistently negative with no evidence of focal neurological deficits, muscle atrophy, or deficits in sensation; that radiological reports showed Plaintiff's condition to be mild; that treatment records showed Plaintiff's pain to be generally managed with oral medication; that Plaintiff sought no orthopedic follow up or re-evaluation and no consultation for surgery; and that Plaintiff's condition responded well to physical therapy. *Id.* He noted that Dr. Reese "[i]ncredibly" restricted Plaintiff's

use of her hands, fingers, and arms, despite a record that contained no evidence of impairment to her upper extremities, a lack of complaints of significant deficits in manipulation or reaching, and testing that showed her to have normal ROM and motor strength in her upper extremities. Tr. at 21–22.

Because the ALJ failed to consider Plaintiff's alleged functional limitations that resulted from IBS and anxiety, his credibility assessment was not based on a review of the entire case record. To that end, he erred in assessing Plaintiff's credibility.

Despite the ALJ's error in assessing the effects of Plaintiff's IBS and anxiety, the undersigned recommends the court find he cited sufficient evidence to conclude that Plaintiff's complaints of back pain were not entirely credible. Although Plaintiff argues that her complaints of pain were consistent with her reports to her medical providers throughout the record, the undersigned's review of the record reveals support for the ALJ's finding that Plaintiff experienced periods of exacerbation of back pain, but that her pain was generally managed through conservative treatment. Plaintiff first reported a recent onset of pain and burning in her right lateral thigh on August 28, 2007. Tr. at 380. She complained of pain in her right leg and low back, underwent multiple diagnostic tests, saw several specialists, and received ESIs between September 2007 and January 2008. *See* Tr. at 282, 295, 302, 332, 333, 374, 376, and 378. However, in March 2008, Plaintiff reported to Dr. Reese that her back and right leg pain had improved as a result of physical therapy. Tr. at 372. Plaintiff did not complain of back pain again for nearly a year and stated at that time that her right leg bothered her when she tried to shop and that she was only using her pain medication on an as-needed basis. Tr. at 369. Dr. Reese

prescribed Vicodin and Lyrica. Tr. at 371. Her next report of pain occurred more than six months later, after she presented to the ER following a fall. Tr. at 511. She continued to complain of pain and weakness in her low back and right leg during follow up visits with Dr. Reese in the month-and-a-half following her fall and received prescriptions for Darvocet-N and Flexeril and a referral to physical therapy. Tr. at 364–65 and 367–68. In March 2010, she reported another injury to her back that she sustained while putting food in her oven. Tr. at 357. She did not complain of back pain again for almost two years. *See* Tr. at 340 (reported left-sided flank and back pain on January 24, 2012, and received a Depo-Medrol injection). Thereafter, Plaintiff's next complaint of back pain came nearly nine months later, when she endorsed pain in her low back, hips, and legs on October 25, 2012. Tr. at 626. She did not report back pain again until June 6, 2013, when she indicated her back pain had been exacerbated over the prior month. Tr. at 656. She continued to complain of back pain and a pins-and-needles sensation in her feet in August 2013 (Tr. at 661), but did not report back pain for another seven months thereafter (Tr. at 664). In light of Plaintiff's statements to her physicians regarding her pain, the medications prescribed, and the type of medical intervention provided, substantial evidence supports the ALJ's conclusion that Plaintiff's back pain was generally managed through conservative treatment, but that she experienced intermittent periods of pain exacerbation.

Plaintiff alleges the ALJ did not cite sufficient evidence to overcome the presumption that Dr. Reese's statement was entitled to controlling weight under the treating physician rule. [ECF No. 10 at 3]. The treating physician rule is derived from 20

C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), which provide that a treating physician's medical opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Nevertheless, "[t]he treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'" *Hines v. Barnhart,* 453 F.3d 559, 563 n.2 (4th Cir. 2006) (*citing Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). If an ALJ determines the treating physician's opinion is not entitled to controlling weight, he must analyze the opinion based on the factors outlined in 20 C.F.R. §§ 404.1527(c) and 416.927(c). SSR 96-2p. The factors to be considered include the following: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability of the opinion based on the provider's treatment record; consistency with the record as a whole; specialization of the medical source; and other factors. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Johnson,* 434 F.3d at 654. The undersigned's review of the record and the ALJ's decision reveals the ALJ not only cited sufficient reasons to overcome the presumption that Dr. Reese's opinion was entitled to controlling weight, but also considered the relevant factors in 20 C.F.R. § 404.1527(c) in evaluating Dr. Reese's opinions. He recognized that Dr. Reese was Plaintiff's treating primary care provider (Tr. at 21) and referenced a number of treatment visits between the two (Tr. at 18–20). However, he explained that he accorded little weight to Dr. Reese's opinions because they were unsupported by her own treatment notes and the record as a

whole. *See* Tr. at 21–22. Thus, the ALJ properly considered Plaintiff's treating physician's opinion as part of the credibility assessment.

In light of the foregoing, the undersigned recommends the court find the ALJ erred in failing to consider Plaintiff's subjective allegations of functional limitations that resulted from IBS and anxiety, but that he cited substantial evidence for rejecting some of Plaintiff's allegations regarding the functional effects of her back pain.

### 4.    Ability to Alternate Sitting and Standing

Plaintiff argues the ALJ erred in finding that her severe impairments would allow her to alternate sitting and standing every 30 minutes during an eight-hour workday. [ECF No. 10 at 13–14]. She maintains that pain, morbid obesity, and weakness and numbness in her lower extremities prevent her from performing work at the RFC assessed by the ALJ. *Id.* at 13. She further contends that a requirement to alternate sitting and standing every 30 minutes conflicts with the ALJ's finding that she could stand for no more than two hours during an eight-hour day. *Id.* at 14. She argues the ALJ presented a different RFC in the hypothetical question to the VE than he adopted in his decision. *Id.* Finally, she maintains the ALJ was required to explain the discrepancy in his assessment that Plaintiff could stand and walk for up to four hours per day in light of the opinions he afforded great weight to that found Plaintiff could stand and walk for only two hours during an eight-hour day. [ECF No. 12 at 3].

The Commissioner argues the evidence supported the ALJ's determination that Plaintiff could perform a reduced range of sedentary work. [ECF No. 11 at 17]. She maintains the ALJ discussed the evidence that demonstrated Plaintiff's ability to

ambulate effectively and that showed improvement in her symptoms of degenerative disc disease. *Id.* She contends the RFC assessed by the ALJ did not limit Plaintiff to standing and walking for no more than two hours during an eight-hour workday, but, instead, indicated she could stand and walk for at least two hours during an eight-hour workday. *Id.* She contends the ALJ did not err in failing to include a maximum of two hours of standing and walking in his hypothetical question to the VE because the ALJ did not limit Plaintiff to a maximum of two hours of standing and walking. *Id.* at 18.

The ALJ found that Plaintiff could sit for six hours in an eight-hour workday; could stand and walk for at least two hours in an eight-hour workday; and required the ability to alternate between sitting and standing every 30 minutes throughout the workday. Tr. at 17. He specifically noted that he included a sit-stand option based on Plaintiff's indication that she had difficulty sitting in one position. Tr. at 22. He indicated he gave great weight to the state agency medical consultants' opinions because they were consistent with the evidence of record. *Id.*

Having recommended the court find the ALJ adequately assessed Plaintiff's allegations of functional limitations as result of pain, the undersigned declines to revisit Plaintiff's arguments that her pain would preclude her from meeting the standing and walking requirements assessed by the ALJ.

Contrary to Plaintiff's argument (ECF No. 10 at 14), the ALJ did not limit her to standing and walking for two hours during an eight-hour workday. He instead found she was capable of standing and walking for at least two hours during an eight-hour workday. *See* Tr. at 17. The ALJ's inclusion of the words "at least" indicate he found that Plaintiff

was capable of standing for two hours or more during an eight-hour workday. Thus, no conflict exists between an ability to stand for at least two hours and an ability to stand for up to four hours, as potentially contemplated in the assessed RFC.

Furthermore, the ALJ's inclusion in the RFC of an "ability" to alternate sitting and standing was intended to accommodate Plaintiff's allegation that her pain was exacerbated by prolonged sitting. *See* Tr. at 22 and 45. This provision permitted Plaintiff to shift from sitting to standing or vice versa every 30 minutes, but was a provision that the jobs mandate Plaintiff to shift positions with such frequency.

The undersigned finds no merit to Plaintiff's argument that a material discrepancy exists between the hypothetical question posed to the VE and the assessed RFC. [ECF No. 10 at 14–15]. For a VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson,* 434 F.3d at 659 (quoting *Walker,* 889 F.2d at 50); *see also English v. Shalala,* 10 F.3d 1080, 1085 (4th Cir.1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano,* 599 F.2d 1309, 1312 (4th Cir.1979). The ALJ asked the VE to assume the hypothetical individual was limited to sedentary work that allowed her to alternate between sitting and standing at 30-minute intervals. *See* Tr. at 75. However, in his decision, the ALJ assessed Plaintiff as having the RFC to lift up to 10 pounds occasionally and lesser amounts frequently, sit for six hours,

stand and walk for at least two hours, and alternate between sitting and standing every 30 minutes. *See* Tr. at 17. The ALJ limited Plaintiff's lifting ability to that consistent with sedentary work. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a). However, by including the ability to alternate between sitting and standing at 30-minute intervals throughout the workday, he contemplated that Plaintiff may exceed the occasional standing and walking involved in sedentary work. *See id.* ("Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."). Therefore, instead of stating in the RFC assessment that Plaintiff was limited to sedentary work, the ALJ specified lifting, standing, and walking provisions. *See* Tr. at 17. While the assessed RFC differs from the hypothetical question posed to the VE, the difference between the two does not alter the applicability of the VE's testimony or the ALJ's reliance on the jobs he identified. The ALJ asked the VE to identify sedentary jobs in response to the hypothetical question, but he also included an ability to alternate between sitting and standing at 30-minute intervals throughout the workday. *See* Tr. at 75. In response, the VE identified jobs at the sedentary level that would allow for up to four hours of standing during a work shift. *See id.* If we are to assume that the assessed RFC did not merely limit Plaintiff to sedentary work, but also contemplated some jobs at the light exertional level that would require up to four hours of standing, Plaintiff would still be presumed capable of performing the jobs identified by the VE at the sedentary level. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (stating that jobs may be classified at the light exertional level if they involve

lifting very little weight, but engaging in a good deal of walking or standing and clarifying that an individual who can perform light work can presumably perform sedentary work, unless she has additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time). Therefore, the undersigned finds that the discrepancy between the hypothetical question posed to the VE and the assessed RFC was inconsequential.

The undersigned further rejects Plaintiff's argument that the ALJ failed to explain his reason for deviating from the state agency medical consultants' opinions regarding her ability to stand. Drs. Brown and Kukla indicated Plaintiff was capable of standing and walking for two hours during an eight-hour workday. Tr. at 95 and 112. The ALJ indicated he accorded "great weight" to the state agency medical consultants' opinions, but he also indicated he provided a "sit/stand" option for every 30 minutes to accommodate Plaintiff's complaint of difficulty when sitting in one position. Tr. at 22. Thus, the ALJ explained that he did not strictly adhere to the limitations advanced by Drs. Brown and Kukla because he gave some credit to Plaintiff's complaint of difficulty remaining in one position for a prolonged period.

### 5.    Exposure to Hazardous Machinery and Unprotected Heights

Plaintiff argues the ALJ erred in assessing an RFC that permitted Plaintiff to work with moderate exposure to hazardous machinery and unprotected heights. [ECF No. 10 at 15]. She maintains that her complaints of dizziness and fatigue and the side effects of her medications prevented her from performing this type of work. *Id.*

The Commissioner argues the ALJ did not err in assessing an RFC that failed to restrict Plaintiff from unprotected heights and hazardous machinery because the record did not show her to have complained of side effects from her medications that would have supported such restrictions. [ECF No. 11 at 18].

The ALJ found that Plaintiff was capable of performing work that required no more than moderate exposure to unprotected heights and dangerous machinery. Tr. at 17. He discredited Plaintiff's testimony that she experienced dizziness and sleepiness as side effects of her medications approximately six times per day, stating "the record failed to reflect reports of these side effects by the claimant to her treating or prescribing physicians." Tr. at 20–21, citing Tr. at 338–93, 632–36, and 655–72. Although Plaintiff cites multiple examples of her complaints of fatigue (Tr. at 340, 343, 346, 348, 350, 352, 357, 359, 364, 369, 372, 374, and 384), these were generalized complaints that were unrelated to Plaintiff's medications[10] and that often accompanied acute illnesses or exacerbations of symptoms. Plaintiff only complained of dizziness on two occasions— once while she was experiencing irregular menstrual bleeding and suffering from a sinus infection and another time when she presented to Dr. Reese to have her medication adjusted. Tr. at 355 and 376. In light of this evidence, the undersigned recommends the court find the ALJ did not err in declining to further reduce Plaintiff's ability to be exposed to unprotected heights and dangerous machinery.

III.     Conclusion and Recommendation

---

[10] In addition, Dr. Reese specified no side effects from Plaintiff's medications that affected her ability to work. Tr. at 676.

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

September 6, 2016                                    Shiva V. Hodges
Columbia, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).